[Cite as *In re F.W.*, 2017-Ohio-5624.]

STATE OF OHIO      )
                        )ss:
COUNTY OF SUMMIT     )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

IN RE: F.W.
        I.W.
        D.W.
        J.W.

C.A. Nos.     28520
                  28529

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 15-08-0536
                DN 15-08-0537
                DN 15-08-0538
                DN 15-08-0539

DECISION AND JOURNAL ENTRY

Dated: June 30, 2017

---

HENSAL, Presiding Judge.

{¶1} Appellants Mother and Father individually appeal the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights to their minor children, F.W., I.W., D.W., and J.W., and placed them in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Mother is the biological mother of F.W. (d.o.b. 12/23/2009), I.W. (d.o.b. 4/19/2012), D.W. (d.o.b. 3/10/2013), and J.W. (d.o.b. 5/18/2015). Father is the presumptive father because the children were born during the course of the parents' marriage.[1] In August

---

[1] Father is also the father of two older children who were previously placed in the permanent custody of CSB. Those children have since been adopted.

2015, CSB filed complaints alleging all four children to be dependent, neglected, and abused on multiple grounds. The complaints were premised on allegations of domestic violence, drug use and manufacturing, deplorable conditions in the home, and Mother's pending child endangering charges. Mother and Father waived their rights to an adjudicatory hearing and agreed that the children were abused and dependent. CSB dismissed the allegations of neglect.

{¶3} After the initial dispositional hearing, the children were placed in the temporary custody of a maternal aunt under an order of protective supervision by the agency. Mother and Father were allowed liberal visitation under the supervision of the maternal aunt. The juvenile court adopted CSB's proposed case plan, and further granted the agency's motion for a reasonable efforts bypass determination as to Father, based on the involuntary termination of Father's parental rights as to two older children. Father agreed to the reasonable efforts bypass. The agency also requested and received permission to decline to file a motion for permanent custody at that time in order to provide Mother with the opportunity to regain custody of the children.

{¶4} At interim review hearings, it was determined that Father was not complying with his case plan objectives. While Mother had begun engaging in services, she became incarcerated due to violating the terms of her probation relative to her child endangering convictions. Other aspects of Mother's compliance had not been verified. Mother moved for a six-month extension of temporary custody to allow her to continue making progress on her case plan objectives.

{¶5} In June 2016, CSB moved for a change of disposition, seeking orders of (1) temporary custody of F.W. to a maternal great aunt and uncle; (2) temporary custody of J.W. to cousins; and (3) emergency temporary custody of I.W. and D.W. to the agency, all due to the temporary custodian-aunt's unwillingness to serve as a permanent placement for the children, as

well as concerns regarding the children's care and safety in the aunt's home. The juvenile court granted the motion.

{¶6} In July 2016, CSB filed a motion for legal custody of F.W. to maternal great aunt and uncle, a motion for legal custody of J.W. to cousins, and a motion for permanent custody of I.W. and D.W. The juvenile court scheduled those matters for hearing in January 2017. In September 2016, however, CSB withdrew its motion for legal custody of F.W. to relatives because the child disrupted from that home. At the same time, the agency withdrew its motion for legal custody of J.W. to relatives who had informed the agency that they wished to provide permanency for the child through adoption instead. Both F.W. and J.W. were then placed in the temporary custody of CSB. In November 2016, Mother filed a motion for legal custody of all four children, or, in the alternative, for a six-month extension of temporary custody. In December 2016, CSB filed a motion for permanent custody of F.W. and J.W. As grounds for both permanent custody motions regarding all four children, the agency alleged that the children could not be placed with either parent within a reasonable time or should not be placed with their parents, and that an award of permanent custody was in the children's best interest.

{¶7} The juvenile court held the dispositional hearing, at the conclusion of which, Mother withdrew her motion for legal custody and maintained her motion for a six-month extension of temporary custody. In its judgment, the juvenile court found that the children could not be placed with either parent within a reasonable time or should not be placed with their parents, and that an award of permanent custody to the agency was in the children's best interest. The court granted CSB's motion for permanent custody and denied all other motions. Mother and Father filed timely appeals, raising a total of three assignments of error. As the assignments of error implicate the same issues, this Court consolidates them for ease of discussion.

II.

MOTHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FINDING THAT IT IS IN THE MINOR CHILDREN'S BEST INTEREST THAT THEY BE PLACED IN THE PERMANENT CUSTODY OF [CSB] AS THE STATE FAILED TO MEET ITS BURDEN OF PROOF BY CLEAR AND CONVINCING EVIDENCE.

MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN GRANTING [CSB'S] MOTION FOR PERMANENT CUSTODY THEREBY TERMINATING THE PARENTAL RIGHTS OF [MOTHER] AS THE TRIAL COURT'S FINDINGS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHICH COULD ONLY LEAD TO ONE CONCLUSION[,] THAT BEING CONTRARY TO THE JUDGMENT OF THE TRIAL COURT.

FATHER'S ASSIGNMENT OF ERROR

THE STATE FAILED TO PRESENT CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE MINOR CHILDREN PURSUANT TO [R.C.] 2151.414(D).

{¶8} Mother and Father argue that the juvenile court erred by awarding permanent custody of the children to CSB. Both raise issues of sufficiency of the evidence and manifest weight. This Court disagrees.

{¶9} Sufficiency and weight of the evidence are both quantitatively and qualitatively distinct. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 23. "[S]ufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a [judgment] is a question of law." *Id.* at ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶10} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the

[judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley* at ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶11} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶12} The juvenile court found that the first prong of the permanent custody test was satisfied because the children could not be placed with either parent within a reasonable time or should not be placed with either parent. In making such a determination, the court must consider "all relevant evidence[,]" including the sixteen factors enumerated in R.C. 2151.414(E). In its judgment entry, the juvenile court cited specifically only to R.C. 2151.414(E)(16), the catchall provision addressing "[a]ny other factor the court considers relevant." However, the trial court made numerous specific findings implicating factors enunciated in approximately six other

subsections of R.C. 2151.414(E). Relying on the plain language of the statute, this Court has held that "the existence of only one of the factors under R.C. 2151.414(E) is sufficient to determine that a child cannot be placed with a parent within a reasonable time." *In re R.L.*, 9th Dist. Summit Nos. 27214, 27233, 2014-Ohio-3117, ¶ 24.

{¶13} As to Father, the evidence established that he had been convicted of child endangering in 2010, regarding a sibling of these children (R.C. 2151.414(E)(6)), and that his parental rights regarding siblings of these children had been previously involuntarily terminated (R.C. 2151.414(E)(11)).

{¶14} As to Mother, the evidence established that she had been convicted of four counts of child endangering in 2015, regarding the four children in this case. R.C. 2151.414(E)(6). Moreover, after violating the terms of her probation for those offenses, she was incarcerated for offenses she had committed against the children. R.C. 2151.414(E)(5).

{¶15} In addition, CSB established by clear and convincing evidence that Mother failed continuously and repeatedly to substantially remedy the conditions which caused the children to be placed outside their home, despite reasonable case planning and diligent efforts by CSB to assist her. R.C. 2151.414(E)(1). That provision states in full:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

*Id*.

{¶16} The children were placed outside the home based on their exposure to drug use (various types), drug manufacturing (methamphetamine), and domestic violence. In addition, the condition of their parents' home was rife with filth and dog feces, yet sparse on necessities like food, appropriate clothing, and furniture. In fact, Mother's child endangering convictions were premised on those conditions in the home.

{¶17} The agency established case plan objectives designed to help Mother remedy these problems. The parents were not living together when the case plan objectives were developed. Mother indicated that she intended to divorce Father. Under the terms of the case plan, Mother was required to establish and maintain housing and provide for her basic needs; obtain a substance abuse assessment, follow all treatment recommendations, and submit to urine drug screens; obtain a mental health assessment and follow all treatment recommendations; and engage in parenting education. CSB made the necessary referrals to assist Mother. At the time of the hearing, Mother had no verifiable income or housing. She moved around, staying with relatives or friends, none of whom could provide an appropriate home for the children. The caseworker and F.W. both believed that Mother had returned to live with Father. The agency presented evidence to show that Father had been evicted shortly before the hearing and that he had not secured new housing.

{¶18} Early on in the case, Mother failed to submit to drug screens until October 2015, when she tested positive for methamphetamine. In November 2015, while on probation for child endangering, Mother absconded. She failed to visit the children, and the agency could not reach her until she was arrested in June 2016. After she was apprehended, she spent 44 days in jail, and her probation was extended for 12 months. Although Mother's probation officer testified that she engaged in substance abuse programming while in jail, she failed to report for any drug

screens for an entire month upon her release in mid-August 2016. Once she began submitting to her scheduled drug screens, she tested negative except for once in October 2016, three months before the permanent custody hearing, when she tested positive for marijuana use. CSB coordinated Mother's drug screens through her probation officer, who scheduled screens on Mondays and Fridays. Just prior to the hearing, the caseworker informed Mother that she would be required to submit to once weekly random screens instead, because the caseworker was concerned that Mother was using something to cleanse her urine to produce false negatives.

{¶19} Although Mother submitted to a mental health assessment in August 2016, she failed to follow through on treatment recommendations. In addition, although she participated in parenting classes in February 2016, Mother failed to follow through with the additional mental health services recommended based on her participation in those classes. She again participated in parenting programming while in jail. Nevertheless, Mother had to be redirected constantly during her visitations with the children. Although she engaged them in play, she consistently discussed inappropriate adult matters with the children, in particular F.W., treating the then six-year old girl as a peer rather than a child. Moreover, the caseworker testified that Mother had not been able to demonstrate the ability to care for herself and keep herself safe, let alone four children, three of whom have significant special needs. Of great concern to both Mother's probation officer and the CSB caseworker was Mother's inability to break ties with Father who directed her into patterns of unsafe behaviors and parenting. Based on Mother's lack of progress in her attempts to resolve the problems that brought the children into care, the caseworker believed that it was not reasonable to believe that Mother could remedy the problems even if given an additional six months.

{¶20} Based on clear and convincing evidence establishing ongoing concerns regarding Mother's ability to provide a safe, secure, and drug-free environment for the children, notwithstanding the agency's reasonable case planning and diligent efforts, Mother had failed continuously and repeatedly to substantially remedy the conditions which caused the children to be placed outside of their home. R.C. 2151.414(E)(1). Under these circumstances, the juvenile court did not err by finding that the children could not be placed with either parent within a reasonable time or should not be placed with either parent. CSB established the first prong of the permanent custody test.

{¶21} The juvenile court further found that an award of permanent custody was in the children's best interest. When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D)(1): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11.

{¶22} Regarding Father, his parental rights were terminated as to two older half-siblings of the four children in this case. R.C. 2151.414(E)(11). In addition, the caseworker testified, and Father concedes, that Father made no efforts to comply with his case plan objectives. He argues only that permanent custody was not in the best interest of the children, because Mother would be in a position to reunify with the children if allowed more time to work her case plan.

{¶23} Without any citation to the record, Mother argues that "[t]he evidence shows that [she] substantially complied with the case plan goals." Father argues that Mother complied with

all case plan objectives, and only yet had to obtain employment and housing. As this Court has repeatedly recognized, while relevant to the juvenile court's best interest determination, case plan compliance is not dispositive of the issue. *See In re T.W.*, 9th Dist. Summit No. 27477, 2016-Ohio-92, ¶ 17; *see also in re K.C.*, 9th Dist. Summit Nos. 26992, 26993, 2014-Ohio-372, ¶ 22, citing *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 21.

{¶24} This Court set out Mother's case plan objectives above. As we noted earlier, in addition to failing to obtain employment and stable housing, Mother did not submit to a mental health assessment until a year into the case. She moreover failed to attend any further appointments or follow through with treatment recommendations in any way, despite diagnoses of anxiety disorder, persistent mood disorder, and severe amphetamine use disorder. Although she participated in substance abuse programming, she again did not do so until nearly the sunset date of the case, and then only after she was in jail after her arrest for absconding. Mother participated in drug treatment services both during her 44-day stay in jail and in an aftercare program. Nevertheless, she failed to submit to urine drug screens for an entire month after her release from jail. Three weeks after she began submitting to drug screens, she tested positive for marijuana use. Finally, although Mother participated in parenting classes approximately six years earlier when F.W. was first removed as an infant, and again during the instant case, the caseworker testified that Mother had not demonstrated that she was capable of providing the necessary attention and oversight for four children, three of whom have significant emotional, behavioral, and educational special needs. Accordingly, the evidence established that Mother had not fully complied with any of her case plan objectives, not merely the requirements that she obtain employment and housing. In fact, the evidence demonstrated that Mother remained in a

state of instability and without the ability to provide a safe, secure, and nurturing home free from abuse.

Interaction and interrelationships of the children

{¶25} The children have witnessed and described ongoing acts of physical abuse of Mother by Father. The three oldest children, in particular I.W. and D.W., exhibit acts of aggression and violence. I.W. has hit other children and choked D.W., while D.W. has kicked multiple pets in his foster home. Both of these boys have locked their foster mother out of the house, because Father had taught them to lock Mother out of the house after throwing her out the door and down some steps.

{¶26} F.W., I.W., and D.W. all engage in sexualized behaviors. After then-six-year old F.W. was caught performing oral sex on a four-year old female visiting her placement home, F.W. explained to her caregiver that "everybody does that to me[,]" including Mother's and Father's drug dealer. The foster mother for I.W. and D.W. reported that the boys pull their pants down and touch their penises. The boys described the "pee" game that their family would play, wherein Father would "eat[] pee" from F.W.'s "butt," and F.W. would "eat[] pee" from their "butts." The boys further described in explicit detail to their foster mother how Father would pull down their pants and suck on their "wieners." I.W. and D.W. noted Mother's participation during some of these incidents. Based on his experiences with Father, I.W. told his foster mother that, when he grows up, he wants to buy a big truck and run over Father, and buy a big gun and shoot Father. All three children exhibit behavioral issues (aggression, defiance, and wetting/soiling themselves) after visitations, particularly when Father is present. Mother relates to F.W. as a peer, rather than as a child, and discusses adult matters with the girl. F.W.

developed a protective, hypervigilant attitude, which was inappropriate for her young age, towards her siblings and Mother.

{¶27} Despite their emotional issues and developmental delays when the children came into care, their behaviors have improved in their current placements. The children have settled in and are all comfortable with their current caregivers. F.W., I.W., and D.W. initially all responded more positively to their female caregivers than to the men in the homes, but all three children have since become more comfortable with their male caregivers.

Custodial histories of the children

{¶28} F.W. was initially removed from Mother's and Father's care along with two older half-siblings when she was an infant, after Father physically abused the two older children. Father's parental rights were terminated as to the two older children, and F.W. was returned to Mother after 11 months in foster care, while Father was in prison for domestic violence and child endangering. When the four children were removed in August 2015, they were all initially placed with Mother's sister ("Aunt"). They were all removed from that home, however, when Aunt failed to enroll F.W. in school or ensure that the children were receiving needed medical and dental care, when Aunt allowed her paramour who had a criminal record and her son who was a juvenile sex offender to move into the home, and when Aunt was permitting Mother and Father to have unsupervised contact with the children.

{¶29} F.W. was quickly removed from her next placement based on behavioral issues, but had been in her current placement over six months at the time of the dispositional hearing. Her current caregivers have watched her become comfortable in their home and attain greater self-confidence due to her improved progress in school. The caregivers are willing to maintain F.W. on a long-term basis.

{¶30} I.W. and D.W. are thriving in their foster home. Despite some ongoing behavioral issues, the boys have become comfortable and are doing well in preschool and daycare. The foster family is not a long-term placement option for them, but CSB was working to facilitate their long-term placement, possibly with a family member.

{¶31} J.W. is very healthy, meeting his developmental milestones, and is very well bonded with his caregivers, who are maternal relatives.

Wishes of the children

{¶32} Due to their young ages, the children did not express their wishes regarding custody. Based on comments by some of the children to their current caregivers, as well as behaviors after visitations, however, it is clear that they did not want to have contact with Father. The guardian ad litem submitted a report in which she recommended an award of permanent custody to CSB.

The children's need for a legally secure permanent placement

{¶33} The children were removed from an environment in which they were exposed to drugs, violence, filth, and sexually abusive behavior. Although Father was the perpetrator of many of the acts of violence and sexual abuse, Mother tolerated the situation and at times participated in such acts. The three oldest children all exhibit aggressive, defiant, and sexualized behaviors as a result of their exposure to the environment created by Mother and Father. Although Mother has on occasion indicated the desire to be away from Father, Mother has not sought a divorce. In fact, witnesses, including F.W., have seen Mother return to Father's home. For whatever reason, Mother has been unwilling or unable to extricate herself from the detrimental and abusive environment with Father.

**{¶34}** The children had been out of their parents' care for approximately 17 months at the time of the permanent custody hearing. Although the three oldest children suffered from emotional, behavioral, and educational deficits, all three were improving and their special needs were being met effectively by their current caregivers. The youngest child was thriving in his placement. F.W. and J.W. are in long-term placements, while the agency is working on and expects to establish a long-term placement for I.W. and D.W.

**{¶35}** Father failed to participate in any case plan services. While Mother worked to comply with some of her case plan objectives, she was never able to demonstrate any long-term sobriety or the ability to provide a safe and stable home for herself, let alone the children. The case worker testified that Father made it clear to her that he did not plan to address any of his case plan objectives, choosing instead to let Mother work her case plan and regain custody of the children, at which time Father planned to step back into the children's lives. The case worker testified, however, that Mother has not been able to demonstrate that she is able to protect the children when Father is in their lives. Based on concerns that Mother and Father had not addressed the problems (including drug use and domestic violence) that brought the children into care, coupled with Mother's failure to obtain employment and independent housing, as well as her refusal or inability to break ties with Father who posed a significant risk of harm to the children, the case worker testified it was not reasonable that the children could be reunified with their parents during the course of a six-month extension of temporary custody.

Applicability of R.C. 2151.414(E)(7)-(11) factors

**{¶36}** Father's parental rights to two older children by another mother were involuntarily terminated.

Conclusion

{¶37} The record demonstrates that the evidence is legally sufficient to sustain an award of permanent custody of the children to CSB. *See Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 11. Moreover, there is nothing in the record to demonstrate that the juvenile court clearly lost its way and created a manifest miscarriage of justice in finding that it was in the best interest of F.W., I.W., D.W., and J.W. to be placed in the permanent custody of the agency. *See id.* at ¶ 20. In fact, there is an abundance of clear and convincing evidence regarding the threat to the children's safety and wellbeing arising from their exposure to the drug culture in which their parents lived, as well as the violence and acts of abuse perpetuated by Father upon or in the presence of the children. The evidence established that Mother sometimes participated in such acts, or frequently tolerated them. Although F.W. was removed from the home once before based on physical violence inflicted by Father on his two older children, Mother continued to maintain a relationship with Father. Further, while maintaining this relationship, Mother allowed Father to have significant contact with F.W. and her three younger siblings during the pendency of this case. Where Father declined to make any efforts with regard to his case plan objectives, where Mother's did not substantially comply with her case plan objectives, and where Mother demonstrated an inability or refusal to extricate Father from her life, the best interest of the children militated against their likely further exposure to drug use, violence, and other abuses in the home. Accordingly, the juvenile court did not err by finding that an award of permanent custody was in the best interest of the children.

{¶38} The juvenile court's termination of Mother's and Father's parental rights and its award of permanent custody to CSB was supported by sufficient evidence and was not against

the manifest weight of the evidence. Mother's first and second assignments of error and Father's sole assignment of error are overruled.

## III.

{¶39} Mother's and Father's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

_____
JENNIFER HENSAL
FOR THE COURT

CARR, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

ANGELA M. KILLE, Attorney at Law, for Appellant.

JAMES E. BRIGHTBILL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

SHUBHRA AGARWAL, Guardian ad Litem.